IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
────────────────────────────
STEVEN J. MONACO,                  :
              Plaintiff,           :    HON. JEROME B. SIMANDLE
                                   :
      v.                           :    Civil Action No. 04-2406
                                   :
CITY OF CAMDEN, et al.,            :    **OPINION**
                                   :
              Defendants.          :
────────────────────────────
```

APPEARANCES:

William M. Tambussi, Esq.
Shawn C. Huber, Esq.
BROWN & CONNERY, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, New Jersey 08108
      Attorneys for Plaintiff Steven J. Monaco

Mark M. Cieslewicz, Esq.
CITY OF CAMDEN OFFICE OF CITY ATTORNEY
City Hall, Suite 419
P.O. Box 95120
Camden, New Jersey 08101-5120
      Attorney for Defendant City of Camden

Ralph Raymond Kramer, Esq.
605 White Horse Pike
Haddon Heights, NJ 08035
      Attorney for Defendant Shay Sampson

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

This case arises out of Plaintiff's claims that he was
beaten, arrested, and maliciously prosecuted by City of Camden
police officers at a concert venue in Camden in May 2002.
Plaintiff's Amended Complaint asserts claims premised upon

federal and New Jersey constitutional law and New Jersey common law against the City and various individual police officers.  On February 13, 2008, the Court issued an Opinion and Order (the "February 2008 Opinion and Order") granting in part and denying in part the defendants' motions for summary judgment.

Presently before the Court is the City's motion for reconsideration [Docket Item 107] of the February 2008 Opinion. In the portion of the Court's Opinion that is the subject of the City's motion, the Court held that the City was not entitled to summary judgment on Plaintiff's claim, brought pursuant to 42 U.S.C. § 1983 and under Monell v. Department of Social Services, 436 U.S. 658 (1978), and its progeny, asserting that the City was liable for its officers' alleged use of excessive force against Plaintiff and malicious prosecution of Plaintiff.  Specifically, the Court found that "triable issues of fact exist as to whether the inadequacy of the City's practices in investigating complaints of excessive force and false arrest against its police officers reflected its deliberate indifference to the risk of unconstitutional officer misconduct," including the conduct which Plaintiff alleges resulted in his injuries.  (Docket Item 101 at 36.)

The City now argues that the Court's Opinion denying the City's motion for summary judgment is not supported by the evidence in the record and should be reconsidered.  For the

reasons set forth below, the Court will deny the City's motion for reconsideration.

**II.  BACKGROUND**

   **A.   The Tweeter Center Incident**

   The facts of this case as they relate to the motion for reconsideration presently before the Court are as follows.  On May 31, 2002, Plaintiff was in a parking lot near the Tweeter Center, a performance venue in Camden, New Jersey, preparing to attend a concert.  (Am. Compl. ¶ 12.)  At approximately 6:00 p.m., a large fight erupted in the parking lot thirty feet away from the plaintiff, to which multiple City of Camden police officers responded.  (Id. at ¶¶ 15-17.)  According to Plaintiff, he did not participate in the fight, but as he was exiting the parking lot, he was misidentified as a participant by a group of police officers, who, without warning and in front of multiple witnesses, threw Plaintiff to the ground and beat him in the head with night sticks.  (Id. at ¶¶ 15, 16, 20.)  The officers handcuffed Plaintiff and, while he was still on the ground, hit him and smashed his face into the pavement.  (Id. at ¶¶ 20-21.)  Plaintiff alleges that he was then taken to the Camden Police Station, where he was searched, threatened, harassed, and thrown against a wall.  (Id. at ¶¶ 27-45.)

   After he had been detained in a cell for approximately two hours, (id. at ¶ 38), Plaintiff was taken to an interrogation

room where Defendant Sampson was waiting.  (Pl.'s Opp'n Br. Ex. V at 132.)   Plaintiff alleges that Defendant Sampson asked Plaintiff what alcoholic beverages he had been drinking at the Tweeter Center, to which Plaintiff replied that he had not consumed alcohol that evening.  (Id. at 132-33.)  Defendant Sampson then insisted that Plaintiff admit that he had consumed alcohol earlier that evening, stating, "you were drinking.  What were you drinking?  You were drinking Coors Light . . . . [Y]ou either tell me you were drinking, or you're going to spend the night in jail."  (Id. at 133.)  Feeling "threatened" and wanting to go to the hospital, Plaintiff complied with Defendant Sampson's demand and stated that he had been drinking that evening.  (Id.)  Defendant Sampson issued Plaintiff a summons for drinking in public, and told Plaintiff not to "even think about trying to fight this," threatening to "hit [him] with five other charges" if he did.  (Id.)

Plaintiff was then released from police custody.  (Id.)  His friends, who had been waiting for him outside the police station, took him to the emergency room at Cooper Hospital, where he was treated for numerous injuries, (Am. Compl. ¶¶ 50-51), including a broken nose and a dislocated jaw.  (Pl.'s Opp'n Br. Ex. V at 126.)

On June 18, 2002, Plaintiff pled not guilty to the summons issued by Defendant Sampson.  (Am. Compl. ¶ 52.)  Defendant

4

Sampson never appeared to testify in the Municipal Court proceedings relating to the public intoxication charge, and the charge against Plaintiff was ultimately dropped for failure to prosecute. (Pl.'s Opp'n Br. Ex. Q at 99.)

**B.   The City's Response to Plaintiff's Claims**

Shortly after the incident at the Tweeter Center occurred, Plaintiff and Police Department Captain Joseph Richardson were both interviewed on television by an NBC news reporter about Plaintiff's allegations that police officers had used excessive force upon him. (Pl.'s Opp'n Br. Ex. S at 61.) According to the reporter in the news story, Captain Richardson said that "they don't know what happened in Steve Monaco's case and they are urging him to contact Camden's Police Internal Affairs." (Def.'s Br. Ex. A.) The news reporter also noted that "Camden Police say they will investigate any allegations that Steve Monaco brings forward, but even so, Steve's parents are talking to attorneys." (Id.)

On August 15, 2002, Plaintiff filed a Notice of Claim with the City pursuant to the New Jersey Tort Claims Act, N.J.S.A. 59.8-1 et seq., in which he informed the City that he had been "wrongfully and unlawfully assaulted, detained, taken into custody and imprisoned," as a result of which he "suffered physical and emotional injuries." (Pl.'s Opp'n Br. Ex. B.) According to the representations of the City's counsel at a

hearing before the Court on February 8, 2008, "the City's
procedure at that time would be to forward [the tort claim
notice] to the third-party administrator, which was [a company
called] CCMSI."  (Tr. at 44.)  The City's counsel also stated
that he was "not aware of what investigation if any they
undertook . . . [but his] suspicion is, not much."  (Id.)

It appears that no investigation into Plaintiff's excessive
force complaint was launched until February 2005, after Plaintiff
filed his Complaint in this action.  (Pl.'s Opp'n Br. Ex. CC at
14.)  Plaintiff deposed Detective Xemaril Cruz, who works in the
Police Department's Internal Affairs division, regarding her
investigation into Plaintiff's claims and the Department's system
for investigating such complaints.  (Id. at 7, 14.)  In
conducting her investigation into Plaintiff's allegations,
Detective Cruz did not ask any of the police officers who might
have come into contact with Plaintiff on May 31, 2002 any
questions, but instead simply informed them that an Internal
Affairs investigation was underway and that they were required to
submit reports to her summarizing their recollections of the
Tweeter Center incident.  (Id. at 24-25.)  Based on the
information she received in these reports, Detective Cruz
determined that Plaintiff's allegations had not been sustained,
which, as she explained during her deposition testimony, meant
that "there was an incident and there was an assault involved,

but it could not be determined if it was the officers who . . . committed the assault . . . due to the large fight that took place." (Id. at 40.)  Detective Cruz did not speak with the officers in order to clarify these indeterminate findings or clarify the contents of their reports.  (Id. at 25.)  When asked during her deposition why she did not speak with the officers and relied exclusively upon the contents of their reports, Detective Cruz replied that "that's the way that we do it."  (Id. at 25.)

### C.  Procedural History

Plaintiff filed this lawsuit on May 25, 2004, naming the City of Camden, the Police Department, Captain Wayne Landham, and ten fictitious John Doe officers as defendants.[1]  Plaintiff alleged that the defendants unlawfully arrested him and used excessive force upon him, in violation of the Fourth Amendment (Count One), the Fifth and Fourteenth Amendment (Count Two), and his "civil rights as guaranteed by" 42 U.S.C. § 1983 (Count Three); that the defendants conspired to violate his rights (Counts Four and Eight); that the defendants' conduct violated New Jersey common law (Counts Five, Six, and Nine) and the New Jersey Constitution (Count Seven); and that these acts caused Plaintiff to experience emotional distress (Count Ten).

In its February 2008 Opinion and Order, the Court granted

---

[1]  Plaintiff subsequently filed an Amended Complaint naming specific officers as defendants.

the individual defendants' motion for summary judgment as to all
of Plaintiff's claims except for his malicious prosecution claim
against Defendant Sampson.  Additionally, and more critically for
purposes of the motion presently under consideration, the Court
denied the City's motion for summary judgment as to Plaintiff's
claims premised upon a municipal liability theory under Monell.
Recognizing that a section 1983 plaintiff cannot hold a municipal
defendant liable for its employees' misconduct under a respondeat
superior theory of liability, the Court explained that under
Monell, "it is when execution of a government's policy or custom,
whether made by its lawmakers or by those whose edicts or acts
may fairly be said to represent official policy, inflicts the
injury that the government as an entity is responsible under §
1983."  Monell, 436 U.S. at 694.  The Court noted that a
plaintiff need not establish that a municipal official issued an
"official statement of policy" to recover under Monell, but may
instead show "that a course of conduct constitutes a 'custom'
when, though not authorized by law, such practices of state
officials are so permanent and well settled that they operate as
law."  Jiminez v. All American Rathskeller, Inc., 503 F.3d 247,
250 (3d Cir. 2007) (some internal quotations and citations
omitted).  Where "the inadequacy of existing practice [is] so
likely to result in the violation of constitutional rights[] that
the policymaker can reasonably be said to have been deliberately

indifferent to the need," a victim of such a violation may
recover from the municipality.  Id. (citation omitted).

Applying this standard to Plaintiff's claims, the Court held
that the City was not entitled to summary judgment because there
were triable questions of fact regarding Plaintiff's claim that
the City had a custom of inadequately investigating its officers'
use of excessive force.  Viewing the evidence in the light most
favorable to Plaintiff and giving him the benefit of all
reasonable inferences, as required by Rule 56, Fed. R. Civ. P.,
the Court first concluded that a jury could find that the City
was aware of Plaintiff's complaint that he had been
misidentified, beaten, arrested, and very seriously injured by
multiple police officers shortly after the Tweeter Center
incident took place.  Among the evidence indicating that the City
was on notice of Plaintiff's allegations in 2002 was a video of
the television news story about Plaintiff – in which Plaintiff
recounted his ordeal and in which the reporter who interviewed
Captain Richardson stated that the Police Department would
investigate Plaintiff's complaint – and Plaintiff's tort claims
notice relating to the incident that he filed in August, 2002.
The Court also determined that a jury could reasonably find that
while the City  was aware of Plaintiff's allegations as early as
2002, no serious investigation into the matter was launched until
2005, after Plaintiff filed suit; indeed, the Court noted, the

City's attorney conceded as much at the February 8, 2008 hearing.

Additionally, the Court found that a jury could conclude from the deposition testimony of Detective Cruz that when the Police Department ultimately launched an investigation into the matter in 2005, "the policies reflected in that investigation showed that the Department was focused less on whether the abusive conduct had taken place than on whether Plaintiff could successfully prove his allegations." (Docket Item 101 at 37.) The evidence supporting this conclusion included Detective Cruz's failure to interview any of the police officers involved in the incident; her failure to attempt to resolve the contradictions between Plaintiff's and the officers' accounts of the events by speaking with any of the parties; and her ultimate conclusion, based on those unresolved contradictions, that Plaintiff's claims could not be sustained. As the Court noted, Detective Cruz's failure to attempt to resolve the ambiguity of the information uncovered in the investigation was not an accidental oversight in this particular case, but was instead, as she testified, "the way that we do it." (Cruz Dep. 25.)

It would be a reasonable inference for a jury to find that the City of Camden had a policy of performing inadequate investigations of citizen complaints of policy brutality that pre-existed Plaintiff's incident in 2002, and which reflected an indifference to the allegedly excessive use of force by its

officers.  Based on this evidence, the Court concluded that a
jury could find that Plaintiff's injuries resulted at least in
part from the City's custom of failing to conduct timely and
meaningful investigations into excessive force complaints, a
custom and practice in existence in the City at the time of
Plaintiff's alleged beatings, and denied the City's motion for
summary judgment.

The City timely filed a motion for reconsideration, which
Plaintiff has opposed.  The Court heard oral argument on the
City's motion at a hearing convened on April 4, 2008, and
reserved decision.

## III. DISCUSSION

### A.    Standard Governing Motion for Reconsideration

Local Civil Rule 7.1(i) governs the Court's review of the
City's motion for reconsideration.  Rule 7.1(i) requires the
moving party to set forth the factual matters or controlling
legal authorities it believes the Court overlooked when rendering
its initial decision.  L. Civ. R. 7.1(i).  Whether to grant a
motion for reconsideration is a matter within the Court's
discretion, but it should only be granted where such facts or
legal authority were indeed presented but overlooked.  See DeLong
v. Raymond Int'l Inc., 622 F.2d 1135, 1140 (3d Cir. 1980),
overruled on other grounds by Croker v. Boeing Co., 662 F.2d 975
(3d Cir. 1981); see also Williams v. Sullivan, 818 F. Supp. 92,

93 (D.N.J. 1993).  To prevail on a motion for reconsideration,
the movant must show either

> (1) an intervening change in the controlling law; (2) the
> availability of new evidence that was not available when
> the court . . . [rendered the judgment in question]; or
> (3) the need to correct a clear error of law or fact or
> to prevent manifest injustice.

Max's Seafood Café ex rel. Lou-Ann, Inc., v. Quinteros, 176 F.3d
669, 677 (3d Cir. 1999).

**B.    The City's Motion**

In its motion for reconsideration, the City identifies what
it argues are three legal and/or factual errors in the February
2008 Opinion.  These three errors fall into two categories.
First, the City argues that Plaintiff failed to present evidence
sufficient to show the existence of the municipal custom that
Plaintiff asserts resulted in his injuries.  Second, the City
argues that in the absence of expert testimony, a jury could not
reasonably conclude that the Police Department's policies for
investigating complaints of excessive force were substandard.
These arguments are addressed in turn below.

    1.   Municipal Liability

       a.   The Parties' Arguments

In asserting his claims against the City, Plaintiff argues
that the conduct of the police officers on May 31, 2002 was
traceable at least in part to the City's custom of failing to
timely investigate complaints of police misconduct, and of

12

performing inadequate investigations when such inquiries did take place.  The City argues that the evidence fails to support Plaintiff's claim as to the existence of this custom, and that the Court thus erred in denying its motion for summary judgment. The City points specifically to two such errors that allegedly undermine the Court's decision.  First, the City argues that the evidence does not support the Court's finding that a jury could find that the City was notified of Plaintiff's allegations of police misconduct shortly after the Tweeter Center incident occurred.  According to the City, while Captain Richardson was interviewed on television about the fracas days after it took place, Captain Richardson's own on-camera statements did not expressly indicate that the Police Department was specifically aware of Plaintiff's allegations that he had been falsely arrested and beaten.  Instead, according to the City, the television interview at most suggests that the Department knew only that a fight had taken place.

Additionally, the City argues that the Court improperly concluded that the City failed to investigate Plaintiff's allegations when Plaintiff filed his tort claims notice in August 2002.  According to the City, the Court should not have considered the City's response to the tort claims notice in deciding the motion for summary judgment because Plaintiff conducted no discovery on that issue, which made it an

13

inappropriate "fact" for the Court to consider in addressing the
City's motion.  Moreover, the City argues that the Court
mischaracterized the representations of its attorney at the
February 8, 2008 hearing concerning the City's response to the
tort claims notice, arguing that there was no "statement at oral
argument by the City's attorney that [it forwarded Plaintiff's
claim to CCMSI] pursuant to normal custom, or that it never heard
back from CCMSI."  (City's Br. 4-5.)  According to the City,
these alleged errors in the February 2008 Opinion require the
Court to reconsider its denial of the City's motion for summary
judgment.

Plaintiff argues that the February 2008 Opinion contained no
such errors and that reconsideration is uncalled for.  First,
with regard to the City's argument that the television interview
with Captain Richardson indicated that he was aware of the fight
at the Tweeter Center but not Plaintiff's allegations of police
misconduct, Plaintiff argues that this claim is undermined by the
contents of the interview itself.  Not only were Plaintiff's
allegations of police officer misconduct the focus of the news
story, but the news reporter in the story, following the footage
of Captain Richardson's interview, stated that the Department
would "investigate any allegations that Steve Monaco brings
forward."  According to Plaintiff, a "justifiable inference[]" to
draw from these facts is that the City was aware that Plaintiff

had been the victim of police misconduct shortly after the incident occurred.  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

Plaintiff also argues that the Court appropriately determined that a jury could reasonably find that the City did not launch an investigation into Plaintiff's allegations when Plaintiff filed his tort claims notice.  Contrary to the City's assertions that Plaintiff conducted no discovery on this issue, Plaintiff notes that under its initial disclosure obligations under Rule 26, Fed. R. Civ. P., and Rule 26.1, L. Civ. R., the City was obligated to disclose to Plaintiff the names of persons likely to have discoverable information and documents that it would use to defend itself against Plaintiff's claims, but that its disclosures contained no information about Plaintiff's tort claims notice.[2]

---

[2]  Plaintiff has also submitted as evidence of his discovery efforts on the issue of his tort claims notice the City's response to Plaintiff's interrogatories and notice to produce documents.  Plaintiff does not, however, submit the interrogatory questions to which the City's answers respond, making the document Plaintiff did submit unclear and of little use in considering the instant motion.

Plaintiff also asserts for the first time in his brief that he "recently served a subpoena duces tecum upon the claims administrator, CCMSI," but that they were "advised by a representative of CCMSI that it has no files or records regarding this incident."  (Pl.'s Opp'n Br. 8.)  Even if Plaintiff submitted evidence of CCMSI's response to his subpoena, which he did not, it would not be relevant to the issue raised by the City's motion for reconsideration, which challenges the

In further support of his claim that the Court did not err in concluding that the summary judgment record was sufficient to support the Court's finding regarding the existence of the City's custom, Plaintiff argues that a jury could consider the City's response to Plaintiff's own allegations in determining whether the City had a custom of inadequately responding to acts of police misconduct. According to Plaintiff, where a municipality fails to meaningfully investigate an especially conspicuous incident of employee misconduct, "the disposition of the policymaker may be inferred from his conduct after the events" that are the subject of the lawsuit. Grandstaff v. City of Borger, Tex., 767 F.2d 161, 171 (5th Cir. 1985); see also Henry v. County of Shasta, 132 F.3d 512, 519-20 (9th Cir. 1997); Bordanaro v. McLeod, 871 F.2d 1151, 1156-57 (1st Cir. 1989); Jones v. Town of East Haven, 493 F. Supp. 2d 302, 331 (D. Conn. 2007). Based on this line of cases, Plaintiff urges the Court not to reconsider its decision that the summary judgment record was sufficient for a reasonable jury to find that the City had a custom of inadequately investigating complaints of police misconduct.

---

sufficiency of the evidence in the record at the time when the Court issued its decision on the City's motion for summary judgment. If considered herein, however, as supplemental evidence, it would further rebut the City's allegation that its own attorney misspoke or was uninformed about CCMSI's non-investigation

b.   <u>Analysis</u>

The Court finds that it did not err in denying the City's
motion for summary judgment as to Plaintiff's claims asserting
municipal liability for the police officers' alleged misconduct
toward Plaintiff, and will thus deny the City's motion for
reconsideration.  First, with regard to the specific evidentiary
objections raised in the City's motion, the Court finds no basis
to reconsider its February 2008 Opinion.  Contrary to the City's
argument, there is sufficient evidence in the record for a jury
to find that while the City was aware of Plaintiff's claims
concerning its officers' misconduct in the summer of 2002, it did
not launch an investigation into Plaintiff's excessive force and
malicious prosecution claims until 2005.  Specifically, a jury
could reasonably conclude that within days of the Tweeter Center
incident, Captain Richardson was aware of the claim that his
officers had misidentified, beaten, and wrongfully arrested
Plaintiff.  The NBC news coverage of Plaintiff's story explained
that police officers misidentified and seriously injured
Plaintiff, and reported that Captain Richardson stated that the
police would "investigate any allegations that Steve Monaco
brings forward."[3]  (Def.'s Br. Ex. A.)   Given that at the

_____

    [3]  The Court rejects the City's argument that the news
report "establishes that reporter Doug Shimell was aware of Steve
Monaco's complaints, but fails to establish that Captain
Richardson or the City of Camden was aware of his being involved
in an alleged incident of excessive force" because the reporter's

summary judgment stage "all justifiable inferences" are drawn in favor of the nonmoving party, Hunt, 526 U.S. at 552 (citation omitted), a jury could reasonably infer that Captain Richardson did not spontaneously offer this statement to the NBC news reporter, but instead knew of Plaintiff's allegations when he spoke to the reporter about them.

Of course, a jury would be free to adopt the City's narrower reading of Captain Richardson's statements and to infer that when Captain Richardson spoke to the news reporter about Plaintiff's allegations, he did not have specific information about the abuses Plaintiff claimed to have suffered.  That a jury could draw such a conclusion does not, however, suggest that it was in error for the Court to instead draw a reasonable inference in favor of Plaintiff, the non-moving party, that when Captain Richardson was interviewed about Plaintiff's allegations and spoke about them with a television news reporter, he knew something about the allegations that were the subject of the

---

comments are hearsay.  (City's Reply Br. 2.)  Although "it is true that what is produced at the summary judgment stage . . . must be reducible to admissible evidence," the Court of Appeals has recognized that "hearsay evidence . . . may be considered if the out-of-court declarant could later present that evidence through direct testimony."  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 466 n.12 (3d Cir. 1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)).  Plaintiff intends to call Captain Richardson as a witness in this case, as the parties' Amended Joint Pretrial Order makes clear.  Because the statement in question can be presented through Captain Richardson's direct testimony at trial, the fact that it is hearsay does not preclude the Court from considering it here.

interview.  It is black-letter law that such reasonable inferences must be drawn in favor of the non-moving party on summary judgment.  Id.

Moreover, even if Captain Richardson was not aware of Plaintiff's allegations at the time of the interview, the City certainly was on notice that Plaintiff claimed to have been "wrongfully and unlawfully assaulted, detained, taken into custody and imprisoned," and to have "suffered physical and emotional injuries," as Plaintiff alleged in the tort claims notice that he filed with the City on August 15, 2002.  (Pl.'s Opp'n Br. Ex. B.)  Notwithstanding the City's protestations that the Court mischaracterized the representations made by its attorney at the February 8, 2008 hearing,[4] there is absolutely no suggestion from the evidence in the record that the City did in fact investigate Plaintiff's allegations when it received his tort claims notice.  To the contrary, in her deposition,

---

[4]  The City's claim that there was no "statement at oral argument by the City's attorney that [the City forwarded Plaintiff's claim to CCMSI] pursuant to normal custom," (City's Br. 4-5), is entirely inaccurate.  As the transcript of the February 8, 2008 hearing reflects, the City's attorney stated that "the City's procedure at that time would be to forward [the tort claim notice] to the third-party administrator, which was CCMSI."  (Tr. at 44.)  Moreover, the distinction between having never heard back from CCMSI, as the Court wrote in its February 2008 Opinion, and CCMSI having undertaken "not much" of an investigation, "if any," (id.), as the City's attorney represented at the hearing, is not a "dispositive factual matter[]," Resorts International, Inc. v. Greate Bay Hotel and Casino, Inc., 830 F. Supp. 826, 831 (D.N.J. 1992), sufficient to warrant reconsideration.

Detective Cruz indicated that no investigation had been
undertaken prior to 2005, which made the investigation that was
ultimately performed more difficult because by 2005 there was "no
video left [and] no communications record left."  (Cruz Dep. 54.)
This evidence is consistent with the representations of the
City's attorney that he was "not aware of what investigation if
any [CCMSI] undertook . . . [but his] suspicion is, not much."
(Tr. at 44.)  In short, the Court did not err in determining that
a jury could reasonably find that the City was aware of
Plaintiff's allegations in 2002 but failed to investigate the
matter until 2005, after this lawsuit was filed.

     Although not raised by the City in its motion for
reconsideration, the Court also finds that it did not err when it
concluded that a jury could consider the City's failure to timely
investigate Plaintiff's own allegations as evidence of the
municipal custom that preexisted the May 2002 incident.  While
the Supreme Court has noted that a claim asserting municipal
liability under Monell is ordinarily established by showing a
pattern of constitutional violations, Board of County Com'rs of
Bryan County v. Brown, 520 U.S. 397, 407 (1997), the Court has
also recognized that where a violation of federal rights is a
"highly predictable consequence" of an inadequate municipal
policy or custom in a situation that is likely to recur,
municipal liability may attach upon a single application of that

custom.  Id. at 409-10 (citing City of Canton v. Harris, 489 U.S.
378, 390 (1989)).  The Court of Appeals for the Third Circuit has
held that Brown and Harris – which discussed this single-
application rule in the context of failure-to-train claims –
apply "to other claims of [municipal] liability through inaction"
as well.[5]  Berg v. County of Allegheny, 219 F.3d 261, 276 (3d
Cir. 2000).  The Court agrees with Plaintiff that police
officers' inclination to employ excessive force may be found to
be a "highly predictable consequence" of a municipality's failure
to investigate excessive force complaints.  Brown, 520 U.S. at
409.

The Court also agrees with Plaintiff that a jury could look
to the City's inaction in the face of Plaintiff's own allegations
of serious police misconduct as evidence of the custom that
existed prior to the Tweeter Center incident.  In addressing the
means by which a plaintiff can establish the existence of a

---

[5]  The Supreme Court has stated that Harris' single-
application rule does not apply to claims premised upon a
municipality's inadequate hiring policies.  Brown, 520 U.S. at
410 (noting that "predicting the consequence of a single hiring
decision . . . is far more difficult than predicting what might
flow from the failure to train a single law enforcement officer
as to a specific skill necessary to the discharge of his
duties").  Plaintiff's allegations that the City inadequately
investigated incidents of police misconduct are much closer to an
inadequate training claim than an inadequate hiring claim.  See
Sample v. Diecks, 885 F.2d 1099, 1116 (3d Cir. 1989) (noting that
"training, defining expected performance by promulgating rules or
otherwise, monitoring adherence to performance standards, and
responding to unacceptable performance" all fall under the
general category of "supervision").

municipal custom, multiple courts have held that "post-event
evidence is not only admissible for purposes of proving the
existence of a municipal defendant's policy or custom, but is
highly probative with respect to that inquiry." Henry, 132 F.3d
at 519; see also Grandstaff, 767 F.2d at 171 (holding that "the
disposition of the policymaker may be inferred from his conduct
after the events"). As the Court of Appeals for the Fifth
Circuit has explained, while "prior incidents of abusive police
conduct tend to prove a pattern or custom and the accession to
that custom by the policymaker," plaintiffs "may encounter
difficulties in making that proof, because of the lack of
available credible witnesses and the avenues for dispute and
distraction over the actual facts of each specific incident."
Grandstaff, 767 F.2d at 171. The court thus held that in cases
where the police abuse is particularly conspicuous, taking into
account such considerations as the number of officers involved
and the seriousness of the allegedly unlawful conduct, "the
disposition of the policymaker may be inferred from his conduct
after the [incident]" underlying the lawsuit. Id. (also noting
that "if that episode of such dangerous recklessness obtained so
little attention and action by the City policymaker, the jury was
entitled to conclude that it was accepted as the way things are

22

done and have been done in the City").[6]

Courts in other jurisdictions have adopted <u>Grandstaff</u>'s post-event evidence rule. <u>See</u>, <u>e.g.</u>, <u>Henry</u>, 132 F.3d at 520 ("a municipal defendant's failure to fire or reprimand officers evidences a policy of deliberate indifference to their misconduct"); <u>Bordanaro</u>, 871 F.2d at 1166-67 (finding that "post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right"); <u>Larez v. City of Los Angeles</u>, 946 F.2d 630, 644 (9th Cir. 1991) (same); <u>Jones</u>, 493 F. Supp. 2d at 331 (noting that "evidence of incidents that occurred subsequent to the incident out of which the plaintiff's claim arises . . . is probative for purposes of showing the existence of a municipal policy or custom"); <u>Kivanc v. Ramsey</u>, 407 F. Supp. 2d 270, 279-80 (D.D.C. 2006) (same); <u>Willis v. Mullins</u>, No. 04 6542, 2006 WL 302343, at *3 (E.D. Cal. Feb. 8, 2006) (same).

In this case, a jury could consider the City's failure to investigate Plaintiff's allegations until nearly three years after the incident took place as evidence of "the existence of a municipal defendant's policy or custom" of failing to timely investigate claims of police misconduct. <u>Henry</u>, 132 F.3d at 519.

---

[6]   The Court of Appeals for the Fifth Circuit has since noted that <u>Grandstaff</u> applies only to instances of "extreme" police misconduct. <u>Snyder v. Trepagnier</u>, 142 F.3d 791, 797 (5th Cir. 1998).

23

As was the case in Grandstaff, Plaintiff's claim did not allege a minor transgression on the part of a single officer; instead, Plaintiff charged that a large number of police officers engaged collectively in an "episode of . . . dangerous recklessness" in which Plaintiff, an innocent bystander to an altercation, was thrown to the ground, beaten on the head with night sticks, arrested, harassed, and maliciously prosecuted.  Grandstaff, 767 F.2d at 171.  While Plaintiff's allegations and injuries were sufficiently serious to warrant being featured on the local television news, there is no evidence suggesting that after it was informed of Plaintiff's claims, the City investigated whether a large number of its employees had engaged in such violent, unlawful conduct until Plaintiff filed a lawsuit years after the incident occurred.  As the Court of Appeals for the Fifth Circuit explained, if allegations of such serious collective misconduct "obtained so little attention and action by the City policymaker, the jury [would be] entitled to conclude that it was accepted as the way things are done and have been done in the City."[7]  Id.; see also Henry, 132 F.3d at 519; Kivanc, 407 F. Supp. 2d at 279-80.

Taking into account post-event evidence of the

---

[7]  Of course, the jury would not be compelled to draw this conclusion, and the City is free to present evidence to refute Plaintiff's claim that it customarily failed to investigate allegations of serious police misconduct.

municipality's custom is not the equivalent of imposing
respondeat superior liability on the City simply for employing a
tortfeasor.  Plaintiff's Monell claims are not premised upon the
notion that the City should be held vicariously liable for its
employees' unconstitutional acts by virtue of its employment of
the officers, but are instead based on the argument that by
failing to investigate complaints of violent misconduct, the City
was "deliberately indifferent to the need" for such
investigations and thus in part complicit in the misconduct that
ensued.[8]  Jiminez, 503 F.3d at 250; see also Beck v. City of

---

[8]  Moreover, as the Court explained in the February 2008
Opinion, and as is discussed in greater detail, infra,
Plaintiff's evidence of the City's customs is not limited to the
City's treatment of his own claim.  Rather, Plaintiff deposed
Detective Cruz of the Police Department's Internal Affairs
division, who testified as to the division's approach to
investigating complaints of officer misconduct, describing "the
way that we do it."  (Cruz Dep. 25.)  As the Court explained in
its February 2008 Opinion, Detective Cruz testified in effect
that under the Department's investigatory policies, investigators
did not interview officers accused of having employed excessive
force, but instead simply compared the officers' and
complainants' written accounts, and when these accounts produced
indeterminate results, found that the complaint could not be
sustained.  (Id. at 24-25, 40.)  As the Court explained, based on
Detective Cruz's testimony, a jury could reasonably find that the
Department's investigations of officer misconduct focused less on
whether the abusive conduct took place than on whether a
complainant could successfully prove his allegations.
    Although not raised by the City, the Court notes that while
Detective Cruz's testimony regarding the Police Department's
investigatory procedures described how those procedures worked in
2005, a jury could reasonably infer that these same procedures
preexisted that May 2002 incident.  Hunt, 526 U.S. at 552.
Detective Cruz's testimony does not suggest that these procedures
evolved over the course of her three years in Internal Affairs,
and nothing in the record suggests any such change in the

Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (noting that custom may "be established by evidence of knowledge and acquiescence"). As the Court of Appeals for the Ninth Circuit has held, where the conduct underlying a lawsuit amounts to a conspicuous violation and such a violation fails to trigger an adequate response from the municipality, such "post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry." Henry, 132 F.3d at 519; see also Grandstaff, 767 F.2d at 171 (noting that "the policymaker's disposition . . . after [the date of the incident] was evidence of his disposition prior to [the date of the incident]").

Finally, the Court also finds that it did not err in determining that there was a plausible causal connection between the City's alleged custom of inadequately investigating complaints of police misconduct and the injuries Plaintiff suffered. See Bielevicz v. Dubinon, 915 F.2d 845, 850-51 (3d Cir. 1990) (noting that "a plaintiff must demonstrate a plausible nexus or affirmative link between the municipality's custom and the specific deprivation of constitutional rights at issue," and that "as long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury")

---

Department's investigatory procedures.

(quotations and citations omitted).  As the Court recognized, supra, if, as Plaintiff argues, the City failed to conduct adequate investigations into excessive force complaints, then a heightened inclination of police officers to use excessive force would be a "highly predictable consequence" of the City's inaction.  Brown, 520 U.S. at 409.  The Supreme Court explained in Brown that "[t]he high degree of predictability may . . . support an inference of causation – that the municipality's indifference led directly to the very consequence that was so predictable."  Id. at 409-10.

A jury could draw such an inference in this case.  There is certainly a "plausible nexus" between the violations Mr. Monaco alleges and the municipal custom of failing to timely investigate complaints of police officer misconduct, and of conducting inadequate investigations when such inquiries ultimately were initiated.  Bielevicz, 915 F.2d at 850; see also A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 583 (3d Cir. 2004) ("a reasonable jury could infer that the failure to establish the policy was causally related to the constitutional violations of which [the plaintiff] complains").  Plaintiff's evidence, if credited by the jury, establishes that the City conducted untimely and/or inadequate investigations into complaints that its officers committed serious civil rights violations.  A reasonable jury could infer a causal connection

27

between this municipal custom and the injuries Plaintiff suffered.

The City, surely, will have an opportunity at trial to undermine the inferences Plaintiff seeks to show about an alleged policy of deliberate indifference to complaints of police misconduct at the time of the incident in this case in May of 2002.  This Court, upon summary judgment, does not weigh the relative likelihoods of success by Plaintiff and the City of Camden.  It is sufficient to note that the matter presents a genuine issue of material fact.

In sum, the Court finds that its determination regarding the existence of the municipal custom in question contained no "clear error of law or fact," making reconsideration of that portion of the decision inappropriate.  Max's Seafood Café, 176 F.3d at 677.

2.   Need for Expert Testimony

In its motion, the City also urges the Court to reconsider its decision by arguing that in order for a jury to find that the Police Department's investigatory policies were inadequate, Plaintiff would have to present expert testimony "to say what the standard is for police investigations of allegations of officer misconduct, or to say that the investigation done by the Camden Police Department in February of 2005 was deficient or inadequate."  (City Br. 5.)  According to the City, an expert is necessary to establish the standard of care for such

28

investigations because the sufficiency of the Department's investigatory procedures is beyond the common knowledge and experience of ordinary jurors.  In the absence of such expert testimony, the City argues, the evidence in the record was insufficient to support the Court's decision denying its motion for summary judgment.

Plaintiff disagrees, arguing that under the law of this Circuit, the adequacy of a police department's internal affairs investigations is not so esoteric a matter as to require an expert to establish the standard of care.  Plaintiff relies upon Beck v. City of Pittsburgh, a section 1983 case contesting the sufficiency of a municipality's response to excessive force claims in which the Court of Appeals indicated in no uncertain terms that such testimony is not essential to a plaintiff's case, stating:

> As for drawing inferences from the evidence regarding the adequacy of the investigatory process, we again agree with Beck that "[t]o require expert testimony to prove this fact is ridiculous.  It is not beyond the ken of an average juror to assess what a reasonable municipal policymaker would have done with the information in this case."

Beck, 89 F.3d at 975-76.  Plaintiff further notes that in other municipal liability cases, the Court of Appeals has indicated that a jury could assess the sufficiency of a municipal policy or custom based not on expert testimony, but on the testimony of an

employee charged with implementing the policy.[9]  See, e.g.,
Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d
Cir. 2003).

The Court did not commit a "clear error of law" in denying
the City's motion for summary judgment on account of Plaintiff's
failure to present expert testimony, Max's Seafood Café, 176 F.3d
at 677, and will thus deny the City's motion for reconsideration.
As Plaintiff argues, under Beck and Natale, the law of this
Circuit is that jurors are equipped to evaluate the adequacy of a
municipality's investigatory process without the assistance of
expert testimony.  See Natale, 318 F.3d at 584 ; Beck, 89 F.3d at
975-76.  Indeed, it is noteworthy that the investigatory process
at issue in Beck was similar to that employed by the Police
Department in this case.  Like the City of Camden Police
Department's investigation processes, the municipal defendant in
Beck "investigate[d] each complaint against an officer for use of
excessive force, and decide[d] whether the complaint [was]
'unfounded,' 'exonerated,' 'not sustained,' 'sustained,' or
'closed by memo.'"  Beck, 89 F.3d at 968.  As in this case, the
plaintiff in Beck contended that under the system employed by the

---

[9]  Plaintiff also submits as evidence the New Jersey
Attorney General's Guidelines for Internal Affairs Policy &
Procedures as evidence of the standard the Police Department
should meet in conducting investigations into police officer
misconduct.  This evidence was not included in the summary
judgment record, and the Court does not rely upon it in deciding
the City's motion for reconsideration.

30

municipality, "a finding of 'not sustained' [would inevitably result] whenever [the municipality was] faced with only the complainant's word against the officer's word," which allegedly resulted in an inadequate process for assessing whether officers had in fact used excessive force.  Id. at 969.  The Court of Appeals made clear in Beck that a jury could assess the adequacy of such a system without the benefit of expert testimony.  Id. at 975-76.

As the Court noted in its February 2008 Opinion, a jury assessing the adequacy of the Department's investigatory process in this case could also consider the fact that the investigators do not interview the complainant or the officers charged with excessive force, and apparently do not make any follow-up efforts to resolve inconsistencies in complainants' and officers' accounts before issuing a finding of "not sustained."  (Cruz Dep. 24-25, 40.)  While a jury would not, of course, be required to conclude that such a failure to attempt to resolve indeterminate outcomes rendered the investigative process inadequate, Beck makes clear that the capacity to draw such a conclusion "is not beyond the ken of an average juror."  Beck, 89 F.3d at 975-76.

The only case cited by the City is not to the contrary.  In Butler v. Acme Markets, Inc., the New Jersey Supreme Court held that in a premises liability action against a supermarket, the plaintiff was not required to present expert testimony to

31

establish the standard of care.  <u>Butler v. Acme Markets, Inc.</u>, 89

N.J. 270, 283 (1982).  In <u>Butler</u>, the court noted that "[a]s to

the absence of expert testimony, except for malpractice cases,

there is no general rule or policy requiring expert testimony as

to the standard of care," and emphasized that while such

testimony "would be an aid to a jury . . . its absence is not

fatal."  <u>Id.</u>  <u>Butler</u> does not suggest that the Court made a

"clear error of law" in denying the City's motion for summary

judgment on account of Plaintiff's failure to present expert

testimony, and thus does not serve as a basis for the Court to

reconsider its February 2008 Opinion.  <u>Max's Seafood Café</u>, 176

F.3d at 677.

## IV.  CONCLUSION

For the reasons explained above, the Court finds that its

February 2008 Opinion did not contain a clear error of law or

fact.  The City's motion for reconsideration will accordingly be

denied.  The accompanying Order will be entered.


**April 14, 2008**                         **s/ Jerome B. Simandle**
Date                                       JEROME B. SIMANDLE
                                           United States District Judge